10 So.3d 387 (2008)
HINDS COUNTY SCHOOL DISTRICT BOARD OF TRUSTEES
v.
R.B., A Minor by and through his next friend, D.L.B.
No. 2006-CT-00326-SCT.
Supreme Court of Mississippi.
December 11, 2008.
Rehearing Denied March 5, 2009.
*389 T. Michael Cronin, James A. Keith, Jackson, attorneys for appellant.
Latrice Westbrooks, Jackson, attorney for appellee.
EN BANC.

ON WRIT OF CERTIORARI
CARLSON, Justice, for the Court.
¶ 1. The Hinds County School District Board of Trustees (School Board) filed a *390 petition for writ of certiorari pursuant to Mississippi Rule of Appellate Procedure 17 after the Court of Appeals' issuance of a plurality opinion affirming the judgment of the Hinds County Chancery Court to reverse and expunge the School Board's decision to expel R.B. from Byram Middle School and the Main Street Alternative School. At the trial court level, the chancery court had ruled that the School Board's removal of R.B. from Byram Middle School due to his possession of a prohibited device and the School Board's subsequent decision to expel R.B. from the Alternative School for drug possession were arbitrary and capricious and unsupported by substantial evidence, resulting in substantial prejudice to R.B. The chancery court had further found that the substantial prejudice caused by the School Board's procedures resulted in a denial of R.B.'s right to due process. The chancery court had ordered that the School Board's disciplinary actions be expunged from R.B.'s record. The School Board appealed, and the Court of Appeals, in a five-five plurality opinion, affirmed the chancery court's judgment. Upon our grant of certiorari, the American Civil Liberties Union and the American Civil Liberties Union of Mississippi (hereinafter collectively the "ACLU") filed a Motion for Leave to File Brief of Amicus Curiae, which motion we in due course granted; therefore, in addition to the briefs of the parties, we now have before us for consideration, the ACLU's amicus brief which was filed pursuant to our order.[1] From the record before us and the applicable law, we are constrained to reverse the judgments of the Court of Appeals and the Chancery Court for the First Judicial District of Hinds County and to render judgment here in favor of the Hinds County School District Board of Trustees.

PROCEEDINGS IN THE TRIAL COURT AND RELEVANT FACTS[2]
¶ 2. R.B., a minor, by and through his next friend, D.L.B., appealed the Hinds County School District Board of Trustees' decision to expel R.B. from Byram Middle School and to place him at the Alternative School for the remainder of the 2004 school year and for the first nine weeks of the following 2004-2005 school year. The expulsion was a result of R.B. possessing what was deemed by the principal, superintendent, and the School Board to be a knife-in violation of school policy and Mississippi Code Annotated section 97-37-17(4).[3] The appeal to the Hinds County *391 Chancery Court was subsequently amended to include R.B.'s May 2004 expulsion from the Alternative School for possession of marijuana. The Chancery Court for the First Judicial District of Hinds County, Chancellor Patricia D. Wise presiding, conducted a hearing in chancery court on February 8, 2005, recessed that hearing, and then concluded the hearing on October 5, 2005. The chancellor reversed the expulsions and ordered them expunged from R.B.'s record.
¶ 3. R.B. was a student at Byram Middle School. On February 5, 2004, R.B. was summoned to the principal's office due to another student's report that R.B. was selling drugs on campus. Principal Campbell obtained R.B.'s consent and searched his backpack. This search resulted in the discovery of contraband, namely an instrument that has been described as both a nail file and a knife. R.B.'s father, D.L.B., was notified. Principal Campbell requested that D.L.B. assist in an additional, more invasive search that would involve the removal of R.B.'s clothing.[4] D.L.B. refused this request. R.B. was subsequently arrested and taken to the detention center, where he was released into D.L.B's custody.[5] As a result of this incident, Principal Campbell recommended that R.B. be expelled from Byram Middle School for one calendar year. The Hinds County School District Admission Appeals Committee[6] held a hearing on February 17, 2004, at which R.B. was allowed to argue on his own behalf. R.B., by and through his next friend, D.L.B., responded to the allegations. The Appeals Committee also read statements from Principal Campbell and the school resource officer, and also viewed a photocopy of the instrument at issue. The Appeals Committee voted to expel R.B. for the remainder of the year and to put him on probation for the next school year. D.L.B. appealed this decision to the Hinds County School District Board of Trustees (the "School Board").
¶ 4. On March 10, 2004, the School Board reviewed the Appeals Committee's decision. D.L.B. gave a statement to the School Board, citing the School Safety Law and Policy Development Handbook in defense of his position that the instrument was an unaltered nail file, not a weapon. For reasons unknown, the actual instrument at issue was not available for examination by the School Board. D.L.B., according to his testimony, presented School Board members with an instrument that he described as identical to the one confiscated from R.B. The School Board assigned the superintendent the task of determining whether the device was a weapon. On March 12, 2004, based on a photocopied depiction of the instrument, the superintendent determined the instrument in question to be a knife in violation of school policy and Mississippi Code Annotated Section 97-37-17(4) (Rev. 2006). Based on this determination, the School Board upheld the Appeals Committee's *392 decision, and R.B. was placed at the Alternative School.
¶ 5. On May 19, 2004, while at the Alternative School, R.B. was accused of possession of marijuana. The marijuana was found in a classroom on a bookshelf near R.B. by an investigative officer. R.B. signed a written statement indicating that another student, J.D., had tossed the marijuana at him and that he had thrown it onto the bookshelf. Two students, including J.D., signed statements that the drugs belonged to R.B., and D.L.B. was again notified and summoned to the school. The Alternative School principal, Bob Mohr, recommended a one-year expulsion. D.L.B. appealed the expulsion to the Appeals Committee. R.B received written notice of the Appeals Committee hearing. This notice stated that R.B. and D.L.B. had the right to protest the expulsion and the hearing, and the notice further stated:
(1) A full statement of the charges lodged against the student is as follows: admitting to possession of a controlled substance and attempting to conceal and sell it;
(2) The names of all persons who are expected to offer statements against the student: Mr. Sheridan Stewart, Mr. Bob Mohr, Mr. Kelvin Mixon.
¶ 6. The notice also provided "[e]ach of you shall also have the right:"
(1) To have counsel present at the hearing;
(2) To cross-examine or otherwise pose questions to persons giving statements adverse to the student: To offer statements by the student and parent(s) or guardian and any other person who has information relevant to the charges advanced by the Administrative head of the Main Street Alternative School.
¶ 7. At this hearing, R.B. spoke on his own behalf. The Appeals Committee also considered five signed statements by students indicating that R.B had been in possession of marijuana. In the end, the Appeals Committee accepted Mohr's recommendation for expulsion.
¶ 8. The School Board met on June 10, 2004, and, after reviewing the evidence considered by the Appeals Committee, affirmed R.B.'s expulsion. D.L.B. later testified at the chancery court hearing that he did not give a statement at this School Board meeting due to not having received notice of the hearing. Instead, according to D.L.B., he received a letter from the School Board after the meeting, informing him that the expulsion for one calendar year had been affirmed.[7] D.L.B. appealed both School Board decisions as to the two separate disciplinary actions, and the chancery court reversed the School Board's decisions concerning both disciplinary actions and ordered that these disciplinary actions be expunged from R.B.'s school records.

PROCEEDINGS IN THE COURT OF APPEALS
¶ 9. The School Board appealed the chancery court's decision to reverse R.B.'s expulsion and to expunge his disciplinary record. The School Board presented the following questions to the Court of Appeals for review:
(1) Was the decision of the Hinds County School District (the "District") Board of Trustees to expel R.B. from Byram Middle School for the remainder of the school year for possession of a knife or *393 dangerous implement on school grounds unsupported by substantial evidence, arbitrary and capricious, or in violation of the statutory or constitutional rights of R.B.?
(2) Was the decision of the Board to expel R.B. from the District for one calendar year for possession of marijuana unsupported by substantial evidence, arbitrary and capricious, or in violation of the statutory or constitutional rights of R.B.?
The Court of Appeals, in a five-five plurality opinion, affirmed the chancery court's decision. Hinds County Sch. Dist. v. R.B., 10 So.3d 495, 497, 2007 WL 2702819 (Miss. Ct.App.2007).
¶ 10. As to R.B.'s Alternative School placement for possession of a weapon, the Court of Appeals affirmed the chancellor's decision to reverse based on its conclusion that the School Board's decision was unsupported by substantial evidence, and, therefore, arbitrary and capricious. Id. at 502, ¶ 27. The plurality interpreted Mississippi Code Annotated Section 37-7-301(e) (Rev.2007) to require the School Board to view the knife and make its own factual findings instead of delegating such authority to the superintendent. Id. at 501-02, ¶¶ 24-25. Additionally, the Court of Appeals noted that a cursory inspection of the instrument in question would have revealed that it was an unaltered nail file, as described by D.L.B., and not in violation of Hinds County policy. Id. at 502, ¶ 27. The plurality opinion stated:
The Court has had the opportunity to examine the device as part of its review of the record. Having viewed the device, it is clear that the School Board's decision to render a final decision without viewing the device was arbitrary and capricious. Had the School Board examined the device, it would have been able to determine that the device was not a "pocket knife," as stated by the school's security officer.
Id. at 502, ¶ 27.
¶ 11. As to the possession-of-marijuana charge, the plurality affirmed the chancellor's decision to reverse, finding that R.B.'s right to due process had been violated at both the Appeals Committee and School Board levels. Id. at 503, ¶ 31. The plurality opinion relied on Warren County Board of Education v. Wilkinson, 500 So.2d 455 (Miss.1986), in determining that R.B. had been deprived of the additional due process guarantees, namely the right to confront witnesses and the right to cross-examine witnesses, as provided for in the notice he received regarding the Appeals Committee hearing. Id. at 503, ¶ 32. Concerning the issue of lack of opportunity for R.B. to confront his accusers, the plurality stated:
The Appeals Committee received evidence in the form of written statements from the other students involved in the incident who placed the blame on R.B. Not only was R.B. not allowed to pose questions to these students, who were not present at the hearing, the Appeals Committee advised D.L.B. that R.B. had no right to even know the names of those students who accused him. Accordingly, regardless of whether R.B. received the minimal due process to which he was entitled as a matter of course, he was deprived of the additional due process protections which the Appeals Committee guaranteed him. See Warren County Bd. of Educ. v. Wilkinson, 500 So.2d 455 (Miss.1986) (holding that where a school board guaranteed a student the opportunity to cross-examine the witnesses against her, failure to provide witnesses constituted a deprivation of procedural due process).
Id.
¶ 12. In reliance on Jones v. Board of Trustees, 524 So.2d 968 (Miss.1988), the *394 plurality determined that the School Board had deprived R.B. of notice and the opportunity to speak on his own behalf when the school district failed to notify R.B. of the June 10, 2004, school board meeting, at which the final decision to expel was made. Thus, according to the plurality opinion, the School Board had deprived R.B. of the requisite minimal due process. Id. at 503, ¶ 33.
¶ 13. In addressing both of these issues, the Court of Appeals dissenting opinion refused to find that the School Board's decisions were unsupported by substantial evidence or resulted in substantial prejudice to R.B. Judge Roberts's dissent, which was joined by four other judges, noted that, due to the School Board's decision being an administrative decision, the chancellor should have conducted a limited review of the decision based solely on the record, but instead, the chancellor wrongly admitted additional evidence and exhibits. Id. at 505, ¶ 44. The dissent interpreted Mississippi Code Annotated Section 37-7-301(e) as authorizing school boards to delegate disciplinary matters to school administrators so long as school boards made the final determination as to the issue of expulsion. Id. at 508, ¶ 58. Additionally, the dissent agreed with the School Board's argument that there was no case law on point requiring a school board to examine the actual "weapon." Id. at 509, ¶ 63.
¶ 14. As to the marijuana-possession allegation, the dissent pointed to R.B.'s "quasi confession" that he had possessed of the marijuana "if only for a brief time." Id. at 511, ¶ 71. The dissent rejected the plurality's findings of a due process violation based on R.B.'s notice and opportunity to appear at the Appeals Committee hearing. Id. at 511-12, ¶ 72. The dissent dismissed the plurality's contention that R.B. was entitled to cross-examine the student witnesses based on the following reasoning:
[T]he School Board does not have the power to compel student attendance at a hearing. Jones, 524 So.2d at 973. See also Miss.Code Ann. § 37-7-301. If the School Board does not have subpoena power then there can be no right to compulsory process for the witness and hence no right of confrontation. Absent subpoena power, it is clearly reasonable for the Appeals Committee to rely on written reports and written statements from witnesses.
Id. at 513, ¶ 78.
¶ 15. We now consider these issues presented via the School Board's petition for writ of certiorari.

DISCUSSION
¶ 16. We begin the discussion by stating that we agree with Judge Roberts's dissent in that an appellate review of this administrative decision should not have gone beyond the record. Id. at 505, ¶ 44 (citing Miss. State Tax Comm'n v. Miss.-Ala. State Fair, 222 So.2d 664, 665 (Miss. 1969)). However, because neither party objected to additional fact-finding by the chancellor, this Court must consider the additional evidence as part of the record pursuant to Mississippi Rule of Appellate Procedure 17(h).
¶ 17. An appellate review of an agency decision is a limited inquiry. "When this Court reviews a decision by a chancery or circuit court concerning an agency action, it applies the same standard of review that the lower courts are bound to follow." Miss. Sierra Club, Inc. v. Miss. Dep't of Envtl. Quality, 819 So.2d 515, 519 (Miss.2002) (citing Miss. Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors, 621 So.2d 1211, 1216 (Miss.1993)). This Court reviews an administrative agency decision to determine *395 whether the decision (1) was unsupported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. Id. (citing Miss. Comm'n on Envtl. Quality, 621 So.2d at 1215). Where there is substantial evidence, "an agency's fact finding must be allowed to stand `even though there might be room for disagreement on that issue'." Miss. Public Service Comm'n v. Merchants Truck Line, Inc., 598 So.2d 778, 782 (Miss.1992) (quoting Babcock & Wilcox v. Roby, 246 Miss. 160, 150 So.2d 129, 130 (1963)). Furthermore, "[m]atters of law will be reviewed de novo, KLLM, Inc. v. Fowler, 589 So.2d 670, 675 (Miss.1991), with great deference afforded an administrative agency's `construction of its own rules and regulations and the statutes under which it operates'." McDerment v. Miss. Real Estate Comm'n, 748 So.2d 114, 118 (Miss.1999) (quoting Miss. State Tax Comm'n v. Mask, 667 So.2d 1313, 1314 (Miss.1995)).
¶ 18. The School Board asserts four points of error by the plurality of the Court of Appeals[8] for our review: (1) the standard of review applied by the Court of Appeals was contrary to the law; (2) the plurality's decision conflicts with prior precedent governing due process in public school disciplinary matters; (3) the plurality erroneously applied and ignored the plain language of Mississippi Code Annotated Section 37-7-301(e); and (4) the plurality erroneously required the physical examination of the "weapon" where no law requires the physical examination of dangerous and/or potentially illegal devices prior to administering student discipline. In the course of our discussion, we will address Issues (3) and (4) together, as they both involve the authority of school boards to delegate disciplinary matters.

I. WHETHER THE PLURALITY IMPROPERLY SUBSTITUTED ITS JUDGMENT FOR THAT OF THE DISTRICT IN DETERMINING THAT THE BOARD'S DECISION WAS ARBITRARY AND CAPRICIOUS, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.
¶ 19. The School Board contends that the Court of Appeals plurality improperly substituted its judgment for that of the School Board by making a factual finding regarding the nature of the object seized from R.B. In doing so, the School Board argues that the Court of Appeals' affirmance of the chancellor's ruling went beyond the arbitrary-and-capricious review standard.
¶ 20. A decision cannot be arbitrary and capricious where there is substantial evidence to support its factual basis. See Miss. Dep't of Human Servs. v. McNeel, 869 So.2d 1013 (Miss.2004). This Court has defined substantial evidence as follows:
Substantial evidence, though not easily defined, means something more than a "mere scintilla" of evidence, Johnson v. Ferguson, 435 So.2d 1191 (Miss.1983), and that it does not rise to the level of "a preponderance of the evidence." Babcock & Wilcox Co. v. McClain, 149 So.2d 523 (Miss.1963). It may be said that it "means such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Substantial evidence means evidence which is *396 substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." State Oil & Gas Bd. v. Mississippi Min. & Roy. Own. Ass'n, 258 So.2d 767 (Miss. 1971); United States v. Harper, 450 F.2d 1032 (5th Cir.1971).
McNeel, 869 So.2d at 1018 (quoting Delta CMI v. Speck, 586 So.2d 768, 773 (Miss. 1991)).
The arbitrary-and-capricious standard has been defined by this Court to mean:
When an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious[,] and an administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone. An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles.
McNeel, 869 So.2d at 1018 (quoting Miss. State Dep't of Health v. Natchez, 743 So.2d 973, 977 (Miss.1999); see also Burks v. Amite County Sch. Dist., 708 So.2d 1366, 1370 (Miss.1998)).
¶ 21. The Court of Appeals plurality took issue with the scale of the photocopy and the fact that the superintendent and the school board viewed a photocopy of the instrument and not the actual instrument which had been seized. The Court of Appeals judges who comprised the plurality viewed the actual instrument and determined that the device was not a knife, but an unaltered nail file, as described by D.L.B. However, from the record and the applicable law, it is obvious that the plurality, contrary to the factual findings of the School Board, substituted its own judgment for that of the School Board. This Court respectfully disagrees with the plurality's findings as to the seized weapon. The record reveals that there exists a reasonable basis to conclude that the object in question was a knife, as categorized by Principal Campbell and the school resource officer present at the time the instrument was confiscated.
¶ 22. The School Board, in reaching its decision that the seized object was a knife, relied upon the Appeals Committee's recommendation; the descriptions of the object by the principal, school resource officer, and superintendent; a photocopy of the object; D.L.B.'s oral arguments and written statement on behalf of R.B.; and the instrument that D.L.B. presented to the School Board during the hearing and described as identical to the one confiscated from R.B. From the record, it is clear that the School Board's decision was based on substantial evidence. Since this case involves a review of an administrative agency's finding, where there is substantial evidence a factual finding should stand "even though there might be room for disagreement on that issue." Merchants Truck Line, Inc., 598 So.2d. at 782 (quoting Babcock & Wilcox, 150 So.2d at 130).
¶ 23. The dissent takes issue with the fact that the photocopy of the device depicted only one prong. Dissent at ¶ 52. As Judge Roberts stated in his dissent for the Court of Appeals, the "obvious and reasonable explanation" for this was that "the photocopied component was the only component alleged to be a knife." Hinds Co. Sch. Dist. v. R.B., 10 So.3d 495, 509 (Miss.Ct.App.2007). The dissent further pointed to testimony by D.L.B. that this device was "part of a manicure set" belonging to the child's mother. Dissent at ¶ 46. However, the dissent ignored R.B.'s testimony wherein he admitted that he considered this device a "knife"describing it as his "slicer" that he used for *397 cutting boxes. As Judge Roberts pointed out the in Court of Appeals dissent, there are three prongs on the instrumenttwo of which are clearly a can opener and a nail file; however, "[t]he fact that the implement contains a nail file does not exempt it from being a weapon if it has other dangerous components." R.B., 10 So.3d at 509.
¶ 24. While a cursory inspection of the knife component may indeed reveal that the "weapon" does not appear menacing, the role of this Court is limited to determining whether there exists a reasonable basis for school officials to find that it could potentially cause harm to other students. The dissent would have us ignore our role and substitute the judgment of this Court for that of the School Board; however, where a reasonable factual basis for the charge exists, the School Board was within its discretion to strictly apply and construe its own policies as to what constituted a weapon and what punishment was appropriate. As this Court has stated, "While it is true that there are many punishments that would seem less harsh or more appropriate in this case, we must recognize that the law commits this entire matter to the discretion of the school board." Covington County Sch. Dist. v. G.W., 767 So.2d 187, 192 (Miss.2000) (quoting Clinton Mun. Separate Sch. Dist. v. Byrd, 477 So.2d 237, 242 (Miss.1985)).
¶ 25. For the reasons stated, we respectfully disagree with the findings of both the Court of Appeals and the Hinds County Chancery Court that the instrument in question was a nail file. These findings ignored the findings of the School Board and the school administrators that the instrument was a "weapon." The School Board understandably argues before us that if the Court of Appeals decision is allowed to stand, "school boards will be left with little, if any, confidence that its discretionary decisions are not subject to reversal merely because a trial court and/or appellate court disagrees. Such a ruling will have a chilling effect on school boards as well as unnecessarily increase the amount of litigation regarding their decisions."
¶ 26. We find that the School Board's determination that R.B. was in possession of a weapon in violation of school policy and Mississippi Code Annotated Section 97-37-17(4) is supported by substantial evidence; therefore, we find that the School Board's disciplinary action in this matter was not arbitrary or capricious and thus is beyond our authority to disturb because of our limited scope of review in administrative matters.

II. WHETHER THE COURT OF APPEALS DECISION CONFLICTED WITH PRIOR PRECEDENT GOVERNING DUE PROCESS IN PUBLIC SCHOOL STUDENT DISCIPLINARY MATTERS.
¶ 27. At issue here is the due process that should be afforded to public school students involved in disciplinary matters. The School Board contends that R.B. received all process due under the law; and, alternatively, even if he were deprived of due process, R.B. suffered no substantial prejudice as a result. The School Board further contends in its petition for writ of certiorari that the Court of Appeals' affirmation of the chancery court's ruling creates a heightened standard for due process that is not required under either the United States Constitution or the Mississippi Constitution, and does not conform with prior precedent regarding student disciplinary matters. R.B. argues that the lack of notice and opportunity to participate in the June 10, 2004, School Board hearing, as well as his not being provided with a list *398 of witnesses for the purpose of cross-examination, deprived him of due process and resulted in substantial prejudice to his defense.
¶ 28. The United States Supreme Court, in Goss v. Lopez, 419 U.S. 565, 581, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975), set forth the minimum due process requirement for students facing a short-term suspension as follows: "Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." The Court further noted that longer suspensions or expulsions may require more formal procedures. Id. at 584, 95 S.Ct. 729. The Fifth Circuit Court of Appeals, in a case involving the long-term suspension of a student, acknowledged that: "The standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved." Keough v. Tate County Bd. of Educ., 748 F.2d 1077, 1081 (5th Cir.1984) (quoting Ferguson v. Thomas, 430 F.2d 852, 856 (5th Cir.1970)). This Court, in Jones v. Board of Trustees, 524 So.2d 968, 972 (Miss.1988), required a showing of "substantial prejudice" in order to prove a denial of due process.
¶ 29. Consistent with the United States Supreme Court's decision in Goss, this Court, in Jones, 524 So.2d at 972, stated that notice and opportunity to be heard are minimal requirements of the Due Process Clause. In Jones, a student was accused of drug distribution on campus. Id. at 969. The accused student, having cross-examined two student witnesses, argued that her due process rights were violated by the school board because she was not provided a list of her other accusers or the right to cross-examine those accusers. Id. at 973. This Court found that no deprivation of procedural due process occurred. Id. As to providing an accused with a witness list, this Court explicitly stated, "Since how much process is due depends on the particular circumstances, a denial of a list of witnesses will not always amount to a prejudicial denial of due process. Particularly, this must be so with student witnesses, since a school board has not been given the power of subpoena." Id. The Court found that there was no deprivation of Jones's confrontation rights when testimony by school administrators alluded to other students who had made incriminating statements against Jones. Id. at 972-973. Furthermore, the Court noted that precedent has revealed that hearsay testimony by school employees is treated differently from that of students, and that admitting hearsay testimony by school employees does not violate a student's right to due process. Id. at 973.
¶ 30. First, R.B. contends that his due process rights were violated because he lacked notice of the June 10, 2004, School Board meeting and was not given an opportunity to speak on his own behalf at this meeting. However, R.B. was given an opportunity to speak on his own behalf to the Appeals Committee. We agree with the School Board that R.B. was afforded the requisite notice and opportunity to speak on his own behalf at the Appeals Committee level of review. Although we acknowledge that Jones, in keeping with United States Supreme Court's holding in Goss, requires both notice and the opportunity to be heard, we find no precedent indicating that R.B. was entitled to two full evidentiary hearings. There is nothing in *399 the record to suggest that the School Board's policies and procedures allowed students more than one hearing. Therefore, R.B. is unable to meet the requisite showing of substantial prejudice where he was granted notice and an opportunity to speak on his own behalf at the Appeals Committee level. This Court, in turn, finds this argument to be without merit.
¶ 31. Secondly, R.B. contends Jones held that due process routinely warrants cross-examination of witnesses, and, at a minimum, receipt of a witness list. In support of this argument, the ACLU in its amicus brief contends that an opportunity for cross-examination should be afforded after weighing all the factors for determining the specific dictates of due process as promulgated by the United States Supreme Court in Mathews v. Eldridge:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The ACLU maintains that the private interest affected, the right to a public education, is a fundamental right under the Mississippi Constitution,[9] and as such, weighs heavily in favor of R.B. not being excluded from the educational system without heightened due process.
¶ 32. The School Board, as well as the Court of Appeals dissent, argue that Jones does not require school boards to produce student witnesses for the purpose of cross-examination, given the fact that school boards do not have subpoena power. The plurality of the Court of Appeals opined that the School Board's notice-of-hearing letter by which R.B. was told that he would have the opportunity to cross-examine witnesses at the Appeals Committee hearing entitled him to cross-examine all witnesses; as such, the School Board's failure to produce these witnesses constituted a violation of R.B.'s right to procedural due process. The plurality relied on Warren County Board of Education v. Wilkinson, 500 So.2d 455 (Miss.1986), in reaching the conclusion that where a school district's own policy has created a right to more than a minimal amount of process, failure by the school district to provide such additional procedures results in a due process violation. We do not disagree with this premise, but it is inapplicable to today's case.
¶ 33. Wilkinson involved a student who was allotted the maximum punishment loss of credit for the entire semesterfor consuming alcohol in her own home prior to attending school. Wilkinson, 500 So.2d at 456. In Wilkinson, the Warren County School District previously had adopted procedures for disciplinary matters that included a de novo hearing before the school board, to which an accused student was entitled to notice, as well as an explanation of charges and penalties, the right to confront and cross-examine witnesses, the right to call witnesses, the right to counsel, and the right to request in writing the names of any witnesses testifying against the student. Id. at 460-61. This Court upheld the chancery court's reversal of the expulsion on the basis that the *400 school district did not follow its own procedures, and the de novo hearing conducted by the school board "became no more than an inquiry and discussion." Id. at 461. This Court distinguished Wilkinson in Jones. "In Wilkinson this Court intimated that a list of witnesses was necessary; however, there the school board's own rules required that a witness list be given." Jones, 524 So.2d at 973.
¶ 34. Concerning the marijuana allegation, R.B. did receive a list of potential witnesses in his notice of the Appeals Committee hearing. The letter reads as follows:
The names of all persons who are expected to offer statements against the student: Mr. Sheridan Stewart, Mr. Bob Mohr, Mr. Kelvin Mixon.
As noted in Jones, hearsay testimony by school administrators does not violate due process. The Appeals Committee's review of hearsay statements given by Stewart, Mohr, or Mixon was not improper. Furthermore, we do not interpret the holding of Jones as requiring school boards in every case to compel attendance of student witnesses at disciplinary hearings for cross-examination, or even requiring full disclosure of those students providing school officials with information.
¶ 35. This Court acknowledged in Jones that the requisite amount of due process requires a case-by-case inquiry. A list of student witnesses and opportunity for cross-examination may be appropriate in some circumstances, such as in cases where school districts have explicitly provided for this right in their policies and handbooks. Unlike the plurality for the Court of Appeals, we do not equate the wording of the notice letter with pre-established school district policy as was the case in Wilkinson. To be precise, in Wilkinson, the school board adopted a procedure for a de novo hearing before the school board, and further provided that a student would be informed in writing of the charges against him, "the possible penalties therefor, that he will have the right to confront and cross-examine witnesses against him, his right to call witnesses in his own behalf, his right to be represented by counsel, and advise him that he may request in writing the names of the witnesses that may testify against him." Wilkinson, 500 So.2d at 460-61. On the other hand, the wording of the notice in today's case is considerably different from the wording of the notice in Wilkinson that was based on the school board's adopted policy. Id. In fact, R.B. and D.L.B. were informed by Principal Mohr that school policy prevented the district from disclosing the students' identities to protect against retaliation. Nothing in the record in today's case indicates that the School Board had a policy providing for the right of cross-examination of all witnesses or disclosure of the students who provided statements to school officials. The dissent cites the current Hinds County School District Handbook as evidence that cross examination of witnesses in disciplinary procedures is School Board policy. Dissent at ¶ 57. The handbook cited by the dissent is that of the current school year, not the handbook from 2004 when this incident occurred. Moreover, this Court is limited to the briefs that were before the Court of Appeals and the record, and any portion of the Hinds County School District Handbook not previously cited therein cannot be reviewed by this Court. See Miss. R.App. P. 17(h). The dissent cites policy that falls outside the record; therefore, this Court will not consider the current Hinds County Handbook.
¶ 36. Furthermore, in the case of a drug offense, all school districts have a substantial interest in maintaining a safe, drug-free environment for their students. *401 To do so, it is important for schools to have the discretion to protect the identity of students who report drug crimes occurring on their campuses. We agree with the School Board that to hold otherwise would potentially endanger students by subjecting them to possible retaliation. Additionally, requiring school districts to identify students who report drug crimes on school campuses has the potential to create a chilling effect on how forthcoming students are with administrators for fear of being identified by those students possessing and distributing drugs at school. In its amicus brief, the ACLU argues that the third Mathews element, the School Board's interest in protecting R.B.'s classmates from being identified or retaliated against, did not outweigh R.B.'s interest given that the record did not show R.B. to be a threat. Mathews, 424 U.S. at 335, 96 S.Ct. 893. However, a drug crime on campus is an egregious offense and is, in and of itself, a threat to the other students. Moreover, based on R.B.'s extensive discipline record and the previous charge of possession of a weapon, we do not find this argument persuasive.
¶ 37. Citing inconsistencies in the statements of R.B.'s classmates, the ACLU argues that the second Mathews factor, the risk of making an erroneous disciplinary decision, is significant enough to compel cross-examination in this case. Id. We do not find this argument persuasive given that the Appeals Committee had access to these statements, to R.B.'s statements made on his own behalf, and to the statements of the school administrators. Thus, as fact-finders, the Appeals Committee had ample opportunity to examine any inconsistencies and to assign the appropriate weight and credibility to those statements. We also agree with the Court of Appeals dissent that school boards do not have the statutory authority to compel students to testify against fellow students at evidentiary hearings. In addition, this is not a case in which the school district denied R.B. the right to call his own witnesses to speak in his defense. As stated in the Appeals Committee notice letter, if R.B. had at any time deemed there were students with information relevant to his defense, he could have produced those students for the purpose of giving a statement to the Appeals Committee.
¶ 38. As to the drug-possession charge, we find the procedures implemented by the School Board to be sufficient where R.B. (1) was apprised of the nature of the charges; (2) was given a list of potential witnesses; (3) was informed of his right to counsel; and (4) was given notice and opportunity to speak on his own behalf and to call any others with relevant information. In fact, as noted by Judge Roberts in his dissent,
Neither R.B. nor anyone on his behalf ever attempted to cross-examine any school employee witness who was present. Moreover, when asked, R.B. stated that he had no additional evidence or witnesses to present to the Appeals Committee. The Appeals Committee and the School Board considered a written report of the confiscation by two school employees, statements from students, and R.B.'s quasi confession. The marijuana was found right where R.B. said he laid it. Even if we assume that R.B. only hid the marijuana for another student, there was a significant amount of evidence that R.B. had dominion and control over marijuana in his possession. Finally, a chemical test revealed that it was, in fact, marijuana that was found.
Hinds Co. Sch. Dist. v. R.B., 10 So.3d 495, 513, ¶ 79, 2007 WL 2702819 (Miss.Ct.App. 2007) (emphasis in original). From the record, R.B. unquestionably was afforded due process. However, even assuming arguendo *402 that R.B. was denied due process, he has failed to make a showing of substantial prejudice. R.B. gave a signed, written statement to Principal Mohr that, upon being alerted to the presence of police on campus, another student, J.D., threw him the bag of marijuana and asked him to hide it. In this statement, R.B. admitted to complying with this request when he tossed the bag onto a nearby bookshelf. R.B. did not refuse the marijuana, nor did he alert his teacher or the police to the presence of the marijuana. It is only when R.B. was questioned as a suspect in connection with the marijuana that R.B. implicated J.D. As noted by Judge Roberts in his dissent, even if the facts as stated by R.B. are accepted at face value, R.B. admitted to a brief possession and subsequent concealment of the bag of marijuana. Id. at 513, ¶ 79. This admission weighs heavily in favor of guilt and against the likelihood that R.B. could have suffered substantial prejudice as a result of the School Board's disciplinary procedures.
¶ 39. In light of all the surrounding circumstances-the nature and severity of drug possession on campus, the number of students who implicated R.B., and R.B.'s own incriminating, signed statement  any school administrator sitting as a fact-finder could reasonably conclude that R.B. was guilty of the drug-possession offense. Although we recognize that this case involves a fundamental right to public education, after applying the Mathews factors, we cannot find any efficacy in added procedures, especially considering the sufficiency of the evidence and the School Board's overwhelming interest in ensuring the safety of its students. Mathews, 424 U.S. at 335, 96 S.Ct. 893. Therefore, even though we have found that R.B. was not denied due process, in addressing the alternative argument that, assuming arguendo that R.B. was denied due process, R.B. has failed to make a requisite showing that he was substantially prejudiced by not being given a second evidentiary hearing at the June 10, 2004, School Board meeting, or by not being provided a list of student witnesses or the opportunity to cross-examine his fellow students at the Appeals Committee or School Board meetings. Therefore, the decision of the School Board to expel R.B. for possession of marijuana was supported by substantial evidence and was not arbitrary or capricious. Thus, we likewise find that as to this issue, the School Board's decision is beyond an appellate court's authority to disturb on appeal.

III. WHETHER MISSISSIPPI CODE ANNOTATED SECTION 37-7-301(e) REQUIRES SCHOOL BOARDS TO CONDUCT THEIR OWN PHYSICAL EXAMINATION OF CONTRABAND PRIOR TO RENDERING DECISIONS.
¶ 40. The School Board argues that the Court of Appeals plurality opinion misinterpreted Mississippi Code Annotated Section 37-7-301(e) when the plurality opined that the School Board improperly delegated to its superintendent the decision as to whether the instrument in question was a weapon. The School Board further contends that there is no precedent requiring school boards to physically examine contraband before rendering a decision.
¶ 41. Mississippi Code Annotated Section 37-7-301(e) states in pertinent part:
The school boards of all school districts shall have the following powers, authority and duties in addition to all others imposed or granted by law, to wit:
....
(e) To suspend or to expel a pupil or to change the placement of a pupil to the *403 school district's alternative school or homebound program for mis-conduct in the school or on school property ... when such conduct by a pupil, in the determination of the school superintendent or principal, renders that pupil's presence in the classroom a disruption to the educational environment of the school or a detriment to the best interest and welfare of the pupils and teacher of such class as a whole, and to delegate such authority to the appropriate officials of the district.
Miss.Code Ann. § 37-7-301(e) (Rev.2007).
¶ 42. Once again, Judge Roberts is correct when he states in his dissent that a plain reading of the statute authorizes school boards to delegate disciplinary and placement decisions to other school administrators, so long as school boards make the final determination. Hinds County Sch. Dist. v. R.B., 10 So.3d 495, 508, ¶ 58 (Miss.Ct.App.2007). Judge Roberts was correct in his assertion that the School Board merely delegated authority to the superintendent in making a determination as to whether the instrument in question constituted a weapon that violated school policy and state law, but the School Board itself made the ultimate determination regarding the expulsion. Id. In addition to the superintendent's determination, the School Board members also viewed the instrument D.L.B. presented them (an instrument he described as identical to the one confiscated from R.B.), heard statements from D.L.B., and received statements from Principal Campbell and the school resource officer describing the instrument as a weapon.
¶ 43. As Judge Roberts's dissent points out, school boards often do not have access to contraband for the purpose of inspection. Contraband, such as a weapon or drugs, is often necessarily and properly confiscated by police. It is quite frequently necessary for school boards to delegate such inspections to school resource officers, principals, or other school officials. Mississippi Code Annotated Section 37-7-301(e) grants school boards the power to suspend and expel "when such conduct by a pupil, in the determination of the school superintendent or principal, renders that pupil's presence in the classroom a disruption" or "a detriment to the best interest and welfare of the pupils." Miss.Code Ann. § 37-7-301(e) (Rev.2007) (emphasis added). Further, the statute provides for delegation of the power to suspend or expel to "the appropriate officials of the district." A plain reading of this language leads to the conclusion that school boards are acting within their statutory authority to delegate such findings of fact in disciplinary matters. Therefore, we respectfully disagree with the Court of Appeals plurality that the School Board abdicated its authority pursuant to Mississippi Code Annotated Section 97-37-17, when its members delegated authority to the superintendent to make a determination as to whether the seized instrument was a weapon. Where school boards make final determinations regarding suspensions and expulsions, even in cases where school administrators have submitted findings of fact to those school boards, those determinations are not per se arbitrary and capricious.

CONCLUSION
¶ 44. For the reasons stated, the judgments of the Court of Appeals and the Hinds County Chancery Court are reversed and the Hinds County School District Board of Trustees' expulsion of R.B. is reinstated.
¶ 45. THE JUDGMENTS OF THE COURT OF APPEALS AND THE CHANCERY COURT FOR THE FIRST JUDICIAL DISTRICT OF HINDS *404 COUNTY ARE REVERSED AND THE HINDS COUNTY SCHOOL DISTRICT BOARD OF TRUSTEES' EXPULSION OF R.B. IS REINSTATED.
SMITH, C.J., WALLER, P.J., RANDOLPH AND LAMAR, JJ., CONCUR. DICKINSON, J., CONCURS IN PART. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J., AND EASLEY, J. DICKINSON, J., JOINS IN PART.
GRAVES, Justice, Dissenting.
¶ 46. The majority's decision to affirm the Hinds County School Board's decision to expel R.B. substantially erodes the due process rights of Mississippi public school students. The record does not support a finding that R.B. was expelled from Byram Middle School on the basis of substantial evidence. Neither does the evidence support a finding that he was afforded due process when expelled from the Hinds County School District. Therefore, I respectfully dissent.

I.
¶ 47. The majority finds that the Hinds County School Board properly expelled R.B., then a twelve-year-old in the sixth grade, for allegedly possessing a weapon. When school officials find that a student has committed misconduct and should be expelled, the student has the right to appeal the school's decision to a three-member Appeals Committee panel. If the Appeals Committee upholds the decision to expel the student for thirty days or more, then the School Board reviews the case and makes a final determination. When reviewing such cases, the School Board sits as a factfinder. Jones v. Bd. of Trs., 524 So.2d 968, 973 (Miss.1988); T.B. ex rel. C.B. v. Bd. of Trs., 931 So.2d 634, 638 (Miss.Ct.App.2006).
¶ 48. In this case, after R.B. and D.L.B. challenged R.B.'s expulsion from Byram Middle School, the School Board[10] upheld the decision to expel R.B. and send him to Main Street Alternative School for the remainder of the 2003-04 school year and the beginning of the 2004-05 school year. The School Board also placed R.B. on probation for the 2004-05 school year. The majority holds that there was substantial evidence justifying R.B.'s expulsion for possessing a weapon.
¶ 49. The majority does not mention that the device  the alleged weapon  belonged to R.B.'s mother and was part of a nail manicure set. The testimony revealed that R.B. and his mother had similar backpacks, and when R.B.'s backpack strap broke, his mother simply transferred R.B.'s books and belongings into her backpack, which, as they later realized, still contained the device in question. R.B. then brought his belongings to school in his mother's backpack.
¶ 50. The device was never viewed or inspected by the Appeals Committee before it upheld the decision to suspend R.B. When reviewing the Appeals Committee's decision, the School Board also did not view the device to determine whether or not it was a weapon. Although contraband such as illegal substances or weapons such as firearms possessed by students may be unavailable for viewing in some cases of student misconduct, this device *405 remained in the control of the school. The School Board provides no explanation as to why the device could not have been examined by either the Appeals Committee or the School Board. Moreover, the nature of the device itself was  and is still  vigorously contested. The fact that the school district, the student, the chancery court, the Court of Appeals, and now this Court cannot agree on the nature of the device is an indication of how important it was for the Appeals Committee and School Board to have examined the object in the first place. A proper inspection of the object was integral to the Appeals Committee's and School Board's decisions as to whether or not R.B. should be expelled. The District Court for the Northern District of Mississippi has stated that "[i]n a system where criminal offenders are afforded individualized punishment upon review of the facts and circumstances regarding the offense, students in our public school systems, who may also face a daunting punishment, should at least be afforded a thorough review of their case, prior to imposition of penalty." Colvin ex rel. Colvin v. Lowndes County, 114 F.Supp.2d 504, 512 (N.D.Miss.1999) (emphasis added). Certainly, in this case, a thorough review by the Appeals Committee and School Board should have included an inspection of the alleged weapon.
¶ 51. But the Appeals Committee merely relied on the reports of Principal Campbell and a school resource officer, both of whom described the device as a pocket knife. The School Board, in turn, relied on the Appeals Committee's findings and the superintendent's opinion regarding the nature of the device. The Court of Appeals plurality concluded that due process was violated when the School Board delegated the authority to classify the device to the superintendent. R.B., 10 So.3d at 509-12. The School Board has a duty, as a factfinder, to make certain factual determinations. See Jones, 524 So.2d at 973. Although superintendents have the statutory authority to suspend or expel students in the first instance, the superintendent's judgment cannot be substituted for that of the School Board when it reviews a decision to punish a student. Miss.Code Ann. § 37-7-301(e) (Rev.2007).
¶ 52. It should be noted that the superintendent never saw the device either. She determined that the device was a weapon based on her review of a blurry photocopy of part of the device. The photocopy depicts the device with only one of the three prongs extended. Also, the size of the device portrayed in the photocopy is slightly larger than the device itself. The record includes a second photocopy, in which the size of the device is significantly larger than its actual size. It is not clear whether the School Board viewed either photocopy. Either way, it had already wrongfully abdicated its factfinding duties by relying on the superintendent's classification of the device.
¶ 53. The majority adopts the School Board's argument that affirming the Court of Appeals' plurality decision will have a "chilling effect" on school boards, which will now be unsure of the bounds of their discretion. Maj. Op. at ¶ 25. I disagree. It would be perfectly reasonable for this Court to hold that when allegations are made against a student regarding an item that may or may not be prohibited and when the item remains in the control and custody of the school district, the Appeals Committee and School Board must actually examine the item. It would then be within the discretion of the Appeals Committee and School Board to determine whether or not the student has committed misconduct.
¶ 54. The Appeals Committee and School Board should have examined the *406 alleged weapon possessed by R.B. It is patently unfair that both the Appeals Committee and School Board would severely sanction a student for possessing a weapon without verifying that the item in question was actually a weapon. That unfairness is condoned by the majority's finding that the School Board did not err when it failed to examine the device before expelling R.B.

II.
¶ 55. The majority also concludes that R.B. was afforded due process throughout the review of the allegations that he possessed marijuana. The School Board upheld the Appeals Committee's recommendation that R.B. be expelled from the school district for one calendar year.
¶ 56. The Supreme Court has held that a student may not be deprived of his or her right to a public education without due process of law. See, e.g., Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725, 734-35 (1975). This Court has held that a school deprives a student of due process when it fails to follow its own procedures. Warren County Bd. of Educ. v. Wilkinson, 500 So.2d 455, 460-61 (Miss.1986). R.B. received written notice of the Appeals Committee hearing regarding the marijuana-related allegations. The notice explicitly provided that he was entitled "[t]o cross-examine or otherwise pose questions to persons giving statements adverse to the student." In determining that R.B. possessed marijuana, the Appeals Committee and School Board relied on typewritten, signed statements given by two students, J.D. and D.W. The statements are self-exculpatory and, to an extent, do not make sense.[11] R.B. did not have the opportunity to cross-examine or otherwise pose questions to J.D. or D.W. at either the Appeals Committee or School Board hearings. In fact, R.B. was not even permitted to view the two statements until after his expulsion, when the School Board produced them to D.L.B.'s attorney in preparation for the chancery court hearing. R.B. should have been permitted to question the two students. At the very least, R.B. should have been given access to their statements in advance of the Appeal Committee and School Board hearings.
¶ 57. I am not persuaded by the majority's attempt to distinguish the facts in Wilkinson, 500 So.2d 455, from the facts in this case. The notice R.B. received informed him that he would be permitted to cross-examine or pose questions to individuals who gave statements against him. The majority claims that the entitlements described in the notice were not a part of the "pre-established school district policy." Maj. Op. at ¶ 35. But the Hinds County School District Policy Handbook states in *407 Section JDE (July 2004) Expulsion that "[a]lthough the [Appeals Committee] proceedings will be conducted informally, the student and parent or guardian are entitled by law to: ... Cross-examine or otherwise pose questions to persons giving statements adverse to the student." Even if the rights listed in the notice were not part of the school's policy, that does not change the fact that R.B. was explicitly informed by school officials that he would be able to exercise certain rights that he was then denied. Fairness requires that R.B. be afforded the entitlements that the school informs him he has. Fairness requires that R.B. be able to rely on the information provided by the school, especially with respect to his rights.
¶ 58. The School Board stated that R.B. would be permitted to cross-examine or question individuals offering statements against him. Yet the School Board denied him that right. That action was a denial of R.B.'s due process rights. See Wilkinson, 500 So.2d at 460-61. Additionally, the denial of access to these statements violated R.B.'s due process rights. Jones, 524 So.2d at 973 ("Though confrontation may not be an absolute necessity  or even advisable  in every case [of student misconduct], written statements should ordinarily be provided."). Thus, at the very least, R.B. should have been given copies of the statements by J.D. and D.W. before the Appeals Committee and School Board hearings.
¶ 59. The majority finds that students who report drug activity at school should be able to provide statements against other students without having their identities revealed or being subject to questioning by the accused student. The majority is wary of the risk of retaliation against students who report drug activity. This is a valid concern and may require that student witnesses remain anonymous in other cases. However, in this case, a compelling argument (which the Court of Appeals plurality accepted) was made that R.B. would not have posed a threat to, or attempted to retaliate against, J.D. and D.W. R.B., 10 So.3d at 503, n. 3. R.B. knew the two students because he was in the classroom with them when the incident occurred. Thus, preventing their statements from being viewed by R.B. in order to protect their identities served no purpose.
¶ 60. The majority references R.B.'s "extensive discipline record" to show that R.B. would have been a threat to J.D. and D.W. Maj. Op. at ¶ 36. The record reflects that during the 2003-04 school year, R.B. was punished for one instance each of fighting, insubordination, and being disruptive in class. I do not believe this can fairly be characterized as an "extensive discipline record."
¶ 61. The majority finds that the School Board cannot produce students to testify as witnesses in disciplinary proceedings because it lacks the subpoena power. Maj. Op. at ¶¶ 14, 32, 37. At the same time, the majority finds that R.B. himself could have produced students to testify in his defense. Maj. Op. at ¶ 37. Firstly, if the School Board cannot produce students to testify, it is highly unlikely that an accused student would be able to persuade a student to testify and subject himself or herself to questions from the School Board. Secondly, an accused student in R.B.'s position may wish to have students, such as J.D. and D.W., testify as adverse witnesses. The risk of retaliation against student witnesses is likely to increase if accused students are responsible for producing them. Students, and perhaps their parents, may solicit other students to testify. There may be tense or heated conversations between students and family members on both sides, particularly when an accused student faces suspension or expulsion. If *408 the student witness decides not to testify, the accused student may be tempted to somehow retaliate. Additionally, placing the burden of production on the accused student could subject him or her to false accusations of retaliation. Not only will accused students face an uphill battle in order to produce student witnesses to testify on their behalf, but they may also risk additional allegations of retaliation against potential student witnesses. Placing the burden of producing student witnesses on the student could potentially lead to numerous other problems developing between students and parents as well. In sum, the majority cannot fairly relieve the School Board of the responsibility of producing student witnesses and then claim that R.B. could and should have produced his own.
¶ 62. Other than the statements of J.D. and D.W., the school offered no direct evidence that R.B. possessed marijuana. The school offered a typewritten statement signed by R.B. stating that J.D. threw him the marijuana, which he then threw onto a bookshelf. The validity of this statement is questionable. The statement is not written in R.B.'s handwriting, but is typewritten and is followed by a number of signatures, including R.B.'s. Before obtaining the statement, Mr. Mohr, the Principal of Main Street Alternative School, told R.B. that they were not going to send him to jail, but that he needed to give a statement. R.B. complied and gave a statement, which was then typed up by Mr. Mohr. Neither of R.B.'s parents were present when the statement was given. R.B. was alone in an office at the school with Mr. Mohr and the school resource officer, Officer Mixon. The testimony reflects that R.B. may have initially been told that he was under arrest. He sat in the office while Mr. Mohr contacted D.L.B. and told him that R.B. had been caught selling marijuana. R.B. was not told that he could decline to give a statement; to the contrary, he was told that the school would keep him out of jail if he provided a statement.
¶ 63. Despite the questionable validity of the statement, both the School Board and the majority rely on an admission contained therein. It was of the utmost importance that R.B. and D.L.B. be given a fair opportunity to defend themselves against the allegations. This should certainly have included the opportunity to cross-examine, or at least view and present arguments undermining the veracity of, the students who gave statements implicating R.B. However, R.B. and D.L.B. were forced to defend against unknown allegations set out in self-exculpatory statements by R.B.'s peers. In a case concerning the discipline of public school students, the Supreme Court stated:
"[Fairness] can rarely be obtained by secret, one-sided determination of facts decisive of rights ...." "Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."
Goss, 419 U.S. 565, 580, 95 S.Ct. 729 (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170, 171-72, 71 S.Ct. 624, 648-49, 95 L.Ed. 817, 853-54 (1951) (Frankfurther, J., concurring)). Nonetheless, this Court concludes today that R.B.'s due process rights were satisfied. By failing to even require that students accused of misconduct be permitted access to statements offered against them, the majority sets a low standard indeed for the due process rights of public school students.
*409 ¶ 64. The majority states that "even assuming arguendo that R.B. was denied due process, he has failed to make a showing of substantial prejudice." Maj. Op. at ¶ 38. Again, I must disagree. The law requires that substantial prejudice be demonstrated in order to show a violation of due process. See, e.g., Jones, 524 So.2d at 972. R.B. has shown that he was substantially prejudiced when he was not given an opportunity to fully present his case to the Appeals Committee. R.B. and D.L.B. were unable to defend against the unknown accusations contained in the student statements that were reviewed and relied upon by the Appeals Committee and School Board. Consequently, the School Board upheld the Appeals Committee's decision to expel R.B. from the entire school district for one calendar year. For these reasons, I disagree with the majority's conclusion regarding R.B.'s right to cross-examine J.D. and D.W. Based on Wilkinson, R.B.'s due process rights were violated when he was denied the opportunity to cross-examine J.D. and D.W. or even to review their statements. Wilkinson, 500 So.2d at 460-61.

III.
¶ 65. Aside from the lack of opportunity to question J.D. and D.W. and the lack of access to their statements, R.B.'s due process rights were violated by the lack of notice for the School Board meeting in which the marijuana-related allegations were reviewed. R.B. had a right to be informed of the meeting so that he would have an opportunity to contest the allegations.
¶ 66. The Supreme Court has held that "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." Goss, 419 U.S. at 574, 95 S.Ct. 729; see also Jones, 524 So.2d at 971 (citing Goss, 419 U.S. 565, 95 S.Ct. 729) ("There is no question that expulsion or suspension from school involves deprivation of a property interest protected by the Due Process clause."). The Supreme Court further declared that
"[A]t a minimum [the abstract words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." [Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865, 873 (1950).] "The fundamental requisite of due process of law is the opportunity to be heard." Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1369 (1914).
Goss, 419 U.S. at 579, 95 S.Ct. 729; see also Jones, 524 So.2d at 972 ("Thus, at a minimum, the due process clause requires notice and opportunity to be heard."). The District Court in the Southern District of Mississippi has stated that the Fifth Circuit requires that students subject to long-term suspensions or expulsions be given a hearing that includes "the `rudimentary adversary elements,'" including notice and the opportunity to contest the allegations. Hill ex rel. Hill v. Rankin County, Miss. Sch. Dist., 843 F.Supp. 1112, 1118 (S.D.Miss.1993). This Court has also recognized the right of students to receive notice of accusations of misconduct so that they can contest them. Jones, 524 So.2d at 971.
¶ 67. R.B. and D.L.B. were not notified of the School Board hearing regarding the marijuana incident, and were thus deprived of the opportunity to present a case to the School Board. The School Board is *410 charged with the weighty responsibility of making final decisions regarding student suspensions and expulsions. Neither the School Board nor the Appeals Committee can merely act as a rubber stamp for the allegations, findings, and recommendations of school officials. See Lee v. Macon County Bd. of Educ., 490 F.2d 458, 460 (5th Cir.1974) ("Formalistic acceptance or ratification of the principal's request or recommendation as to the scope of punishment, without independent Board consideration of what, under all the circumstances, the penalty should be, is less than full due process."). When reviewing allegations of student misconduct, the Appeals Committee and School Board must independently review the claims and evidence. Fairness requires that the accused student at least be given notice of the School Board hearing so that he or she can be present to contest the school's allegations.
¶ 68. The Supreme Court has noted that
[d]isciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.
Goss, 419 U.S. at 580, 95 S.Ct. 729. Certainly, it would not have been prohibitively costly and would not have interfered with the educational process to provide adequate notice through a simple letter to R.B. and D.L.B. informing them of the School Board hearing. Section JDE (July 2004) Expulsion of the Hinds County School District Policy Handbook clearly acknowledges the right of a student "to appear before the school board" when facing an expulsion for thirty days or more. This Court has stated that "though courts should not become involved in running schools, expulsion and suspension are severe sanctions requiring solemn attention to a pupil's rights." Jones, 524 So.2d at 973. At the very least, R.B. and D.L.B. should have been notified of the School Board hearing in which it would review the Appeals Committee's recommendation to expel R.B. from the entire school district for a year.
¶ 69. Again, R.B. suffered prejudice from the lack of notice. He was denied the right to be present and contest the allegations against him before the individuals who would be deciding his punishment. He was denied the bare minimum that due process guarantees  notice and the opportunity to be heard. See, e.g., Goss, 419 U.S. at 579, 95 S.Ct. 729 (citations omitted). There may be no legal precedent binding on this Court "indicating that R.B. was entitled to two full evidentiary hearings," but due process requires notice and the opportunity to be heard, especially in cases such as this, where the student's right to public education is at risk for an extended period of time. Maj. Op. at ¶ 30.
¶ 70. School officials interact on a daily basis with students and may interact regularly with students' parents as well. It follows that school officials may not always be able to maintain objectivity with regard to certain students and parents. School officials may harbor negative, or even antagonistic, feelings towards certain students and parents. The facts of this case are a helpful illustration of this point. Shortly before the Appeals Committee hearing for the "weapon"  related allegations, D.L.B. had met with Principal Smith of Gary Road Intermediate School. D.L.B. had raised questions challenging the process through which P.T.A. officers were selected. When D.L.B. arrived at a follow-up meeting with Principal Smith, he found that the latter had summoned a *411 member of the police department to his office because he thought that D.L.B. "might get out of hand." D.L.B. later discovered that Principal Smith was a member of the three-person panel comprising the Appeals Committee reviewing the allegations that R.B. possessed a weapon. The earlier interactions between Principal Smith and D.L.B. left D.L.B. with serious doubts as to whether Principal Smith and the Appeals Committee panel would exercise the necessary objectivity with respect to the accusations against R.B.
¶ 71. In situations such as this, it is crucial that the Appeals Committee and School Board diligently, conscientiously, and impartially review all the relevant evidence, hear both sides' versions of events, and determine the culpability, if any, of the student as well as the appropriate punishment. In reaching these determinations, the Appeals Committee and School Board should be mindful of the negative impact that their decisions can have on the futures of young students  especially in the case of suspensions and expulsions. The right to a public education is a fundamental right protected by states. Clinton Mun. Separate Sch. Dist. v. Byrd, 477 So.2d 237, 240 (Miss.1985). This Court has held that "the right to a minimally adequate public education created and entailed by the laws of this state is one we can only label fundamental." Id.; see also Hill ex rel. Hill v. Rankin County, Miss. Sch. Dist., 843 F.Supp. 1112, 1117 (S.D.Miss.1993) (stating that Mississippi Code Section 37-1-2 provides the children of Mississippi the right to a free public education). In the landmark decision, Brown v. Board of Education, the Supreme Court stated that
education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society .... It is the very foundation of good citizenship .... [I]t is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment ... [I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.
Brown v. Bd. of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954).
¶ 72. In Goss v. Lopez, the Supreme Court recognized that the charges of misconduct lodged against several students "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." Goss, 419 U.S. at 575, 95 S.Ct. 729. Undoubtedly, the punishments accompanying the charges can do similar, if not greater, harm to a student's future. In recent years, public schools have engaged in increasingly punitive practices with regard to students who misbehave. NAACP Legal Defense and Educational Fund, Inc., Dismantling the School-to-Prison Pipeline 1 (2006). The NAACP Legal Defense and Educational Fund (LDF) has reported that "the punitive and overzealous tools and approaches of the modern criminal justice system [that] have seeped into our schools ... hasten [students'] entry into the juvenile, and eventually the criminal, justice system, where prison is the end of the road." Id. Others have found this to be true as well: students who are suspended are at high risk of being disciplined again, dropping out of school, and entering the juvenile justice system. Miriam Rokeach & John Denvir, Front-Loading Due Process: A Dignity-Based Approach to School Discipline, 67 Ohio St. L.J. 277, 284-6 (2006). This phenomenon *412 is commonly referred to as the school-to-prison pipeline or the schoolhouse-to-jailhouse track. See, e.g., Avarita L. Hanson, Have Zero Tolerance School Discipline Policies Turned into a Nightmare? The American Dream's Promise of Equal Educational Opportunity Grounded in Brown v. Board of Education, 9 UC Davis J. Juv. L. & Pol'y 289, 340 (2005).
¶ 73. Because of fears of school violence, public school officials have turned to harsh disciplinary policies including mandatory zero-tolerance policies, which often result in suspensions and expulsions that remove students from their schools. Frances P. Solari & Julienne E.M. Balshaw, Outlaws and Exiled: Zero Tolerance and Second Generation Race Discrimination in Public Schools, 29 N.C. Cent. L.J. 147, 149 (2007); Rokeach & Denvir, supra, at 282; NAACP Legal Defense and Educational Fund, Inc., supra, at 2. However, "[a] study of school violence... found that after four years of implementing zero tolerance policies, schools employing zero tolerance reported greater levels of discipline problems than schools without zero tolerance." Rokeach & Denvir, supra, at 284.
¶ 74. Increasing numbers of children are removed from public schools for increasingly minor conduct. NAACP Legal Defense and Educational Fund, Inc., supra, at 2-3; see also Rokeach & Denvir, supra, at 284. When faced with disciplining students, school boards are often focused on a quick, simple solution  ridding the school of the "problem students," who are then left "out in the community, unsupervised and unsupported." Rokeach & Denvir, supra, at 280-82. This has serious consequences for children who are removed from school for even a few days. It has been pointed out that "[w]hen kids are removed from school, they end up in inferior settings such as suspension centers, alternative schools, and juvenile prisons  places where meaningful educational services are practically nonexistent and students with histories of behavioral problems can negatively influence one another." NAACP Legal Defense and Educational Fund, Inc., supra, at 4; Augustina Reyes, The Criminalization of Student Discipline Programs and Adolescent Behavior, 21 St. John's J.L. Comm. 73, 78 (2006). This observation resonates with the facts of this case. When R.B. was expelled from Byram Middle School, he was sent to Main Street Alternative School. At the alternative school, R.B. and several other students were left unsupervised in a classroom and someone brought out some marijuana. Every morning before R.B. went to the alternative school, he was searched at home by D.L.B. and then, when he got to school, he was searched by security officers. On the day of the marijuana incident, R.B. was only carrying three books, without a backpack, and $1.50 in his pocket for lunch. He was only wearing jeans and a t-shirt because coats were not permitted. Despite his basic attire and lack of personal belongings, R.B. was expelled for possession of marijuana[12].
¶ 75. By concluding that the Hinds County School Board properly expelled R.B. from Byram Middle School and from the entire school district, the majority has dealt a serious blow to the due process rights of our public school students. Not only did the Appeals Committee and School Board never view the alleged weapon possessed by R.B., but the Appeals *413 Committee denied him the right to question student witnesses, and the School Board denied him the basic right to notice. For all the reasons stated herein, I respectfully dissent.
DIAZ, P.J., AND EASLEY, J., JOIN THIS OPINION. DICKINSON, J., JOINS THIS OPINION IN PART.
NOTES
[1] The ACLU's motion for leave to file amicus brief did not go uncontested by the School Board, which filed its Response to Motion for Leave to File Brief of Amicus Curiae. The ACLU thereafter filed its Supplemental Brief in Support of Motion For Leave to File Brief of Amicus Curiae, and the School Board then filed its Response to ACLU's Supplemental Brief in Support of Motion for Leave to File Brief of Amicus Curiae. In due course, this Court granted the ACLU's motion for leave to file amicus brief and the ACLU filed its amicus brief pursuant to this Court's order.
[2] Almost all of the facts are gleaned from the trial court's opinion.
[3] Mississippi Code Annotated Section 97-37-17(4) (Rev.2006) reads as follows:

It shall be a misdemeanor for any person to possess or carry, whether openly or concealed, any BB gun, air rifle, air pistol, bowie knife, dirk, dagger, slingshot, leaded cane, switchblade knife, blackjack, metallic knuckles, razors and razor blades (except solely for personal shaving), and any sharp-pointed or edged instrument except instructional supplies, unaltered nail files and clips and tools used solely for preparation of food, instruction and maintenance on educational property. Any person violating this subsection shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than One Thousand Dollars ($1,000.00), or be imprisoned not exceeding six (6) months, or both.
[4] There is some dispute by the parties in their statements as to whether Principal Campbell requested this additional search involving the removal of R.B.'s clothing, or whether Principal Campbell had summoned D.L.B. to assist with the search because R.B. was the one who wished to remove his clothing for a more invasive search.
[5] D.L.B. testified that Mr. Campbell had given him the choice to either consent to a more invasive search of R.B. (including removal of his underwear); or, in the alternative, Principal Campbell would have R.B. arrested for possession of a weapon.
[6] The Appeals Committee is made up of three members and a hearing officer, who conducts the proceedings.
[7] In viewing the letter to D.L.B. dated June 11, 2004, we note that the language implies that notice of the School Board hearing was given. The letter opens, "As you were notified, the Hinds County School Board met in regular session at 5 P.M. on Thursday, June 10, 2004."
[8] Throughout Hinds County's Petition for Certiorari, the Appellants refer to the Court of Appeals majority. Since the decision was a five-five split, our discussion references the Court of Appeals plurality.
[9] The ACLU cites Board of Trustees of Pascagoula Municipal Separate School District v. T.H., 681 So.2d 110, 114 (Miss. 1996).
[10] It should be noted that, as the Court of Appeals plurality points out, D.L.B. and R.B. were permitted five minutes to speak at the School Board meeting, but were excluded from the rest of the meeting, including the portion during which the school presented evidence against R.B. Hinds County Sch. Dist. Bd. of Trs. v. R.B., No.2006-CA-00326-COA, 10 So.3d 495, 508 (Miss.Ct.App.2007).
[11] J.D.'s entire statement reads as follows: "I, [J.D.], admit to when I came to school I bought some `weed' (marijuana) from [C.B.] at school and then bought some more marijuana from [Z.M.] and then gave all the marijuana to [R.B.] and [R.B.] tried to frame me for it by hiding it in his desk."

D.W.'s entire statement reads as follows:
[R.B.] and [J.D.], they the ones who had it, they were trading it back and forth. [R.B.] had most of it and [J.D.] was asking for change to buy some from [R.B.]. [J.D.] asked [C.] and [C.] said I am not fixing to get involved with ya'll. [R.B.] sold some to [B.] and gave or sold some to [G.]. [R.B.] was supposed to put it in the bathroom, but [G.] couldn't find it so he told [R.B.] he wanted his money back. [R.B.] said, `I put it up there, so it is just ya'll's problem.'
[R.B.] has it at school. [R.B.] showed the marijuana. [R.B.] also showed the money. [R.B.] said [B.] is my # 1 costomer [sic]. [R.B.] was also talking to [Z.]. These conversations occurred in Butler's, Mixon's and John's rooms.
[C.L.] said that whoever had weed needed to hide it (Mrs. John's room).
[12] The initial allegations against R.B. were that he possessed and attempted to conceal and sell marijuana.